## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, v. JACK FISHER Defendant. | CASE NO.: 1:21-CR-00231-TCB-CMS |

## MOTION TO DISMISS FOR UNCERTAIN LAW AND UNCONSTITUTIONAL VAGUENESS

### I.    Introduction

This case—the first criminal prosecution of its kind—is an attempt to criminalize actions that are either legal, or, at the very least, are subject to scrutiny as vague, highly debatable, unclear, or uncertain.  Such a prosecution is not permitted as a matter of law until "fair warning" has been given through a *civil* tax case.  While the government arguably has attempted to issue such a warning, the rulings in those cases have only reinforced the lawful nature of the actions alleged here.

### II.    Legal Background

The Eleventh Circuit has held that in criminal tax cases, "[i]t is settled that when the law is vague or highly debatable, a defendant—actually or imputedly— lacks the requisite intent to violate it."  *United States v. Heller*, 830 F.2d 150, 154 (11th Cir. 1987) (quoting *United States v. Critzer*, 498 F.2d 1160, 1162 (4th Cir.

1

1974)).  That point of law originates from the United States Supreme Court, *James v. United States*, 366 U.S. 213 (1961), and is unique to tax cases.  As a result, criminal proceedings may not be used to define and punish an alleged failure to conform to unclear or uncertain tax standards.  *United States v. Mallas*, 762 F.2d 361 (4th Cir. 1985).

In other words, where no reasonable person could "have ascertained the legal standards applicable to their conduct, criminal proceedings may not be used to define and punish an alleged failure to conform to those standards." *United States v. Harris*, 942 F.2d 1125, 1131 (7th Cir. 1991).  In such cases, "willfulness" is not a matter of the subjective intent of the defendant;[1] instead "[i]f the obligation to pay a tax is sufficiently in doubt, willfulness is <u>impossible as a matter of law</u>, and the 'defendant's actual intent is irrelevant.'"  *Id.* (citing *United States v. Garber*, 607 F.2d 92, 98 (5th Cir. 1979)[2] (en banc)) (emphasis added); *see also United States v. McClain*, 593 F.2d 658, 672 (5th Cir. 1979) (reversing a conviction, rather than

---

[1] The issue here is thus different than the requirement that the government must prove "willfulness" on the part of the Defendant, an element that also receives "special treatment" here because of "the complexity of the tax laws." *Cheek v. United States*, 498 U.S. 192, 201 (1991).  Proving the willfulness of a defendant is subjective and focuses on whether a particular defendant acted with intent.  That is a question for the jury.  The issue here, whether the law provided clear guidance any reasonable person could follow, is a question of law for the Court.

[2] Decisions of the Fifth Circuit prior to October 1, 1981 are binding precedent. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

remanding for a new trial).  Therefore, whether the legal standards applicable to the alleged conduct are vague, highly debatable, unclear, or uncertain—such that they cannot sustain a criminal prosecution—is a question of law for the Court.  *Critzer*, 498 F.2d at 1162.

This case should thus be dismissed.  As explained below, the law, as applied to the allegations in the indictment, lacks clarity.  As a result, the actions alleged cannot rise to the level of a federal crime.  Indeed, the Eleventh Circuit has held that the federal tax treatment of conservation easements is "intimidating on its face" because it is situated "at the intersection of obscure common-law property concepts and the often byzantine Internal Revenue Code."  *Pine Mountain Pres., LLLP v. Comm'r of Internal Revenue*, 978 F.3d 1200, 1202 (11th Cir. 2020).[3]

Because this rule requiring certainty in the tax laws to support a criminal prosecution "is based on the Constitution's requirement of due process and its prohibition of *ex post facto* laws[,] the government must provide reasonable notice of what conduct is subject to criminal punishment."  *Harris*, 942 F.2d at

---

[3] Additionally, while, in general, deductions are seen by courts as a matter of legislative grace and thus strictly construed, "courts have liberally construed statutory provisions for charitable contributions in the taxpayer's favor" or under ordinary standards "because such deductions are an expression of public policy rather than legislative grace."  *Hewitt v. Comm'r of Internal Revenue*, 119 T.C.M. (CCH) 1593 (T.C. 2020); *BC Ranch II L.P. v. Comm'r of Internal Revenue*, 867 F.3d 547, 553 (5th Cir. 2017) (noting that strict construction "does not apply . . . to deductions for conservation easements").

1131; *McClain*, 593 F.2d at 665 ("It is elementary that criminal statutes must give notice of the acts they prohibit before valid penalties may be imposed thereunder."); *United States v. Dahlstrom*, 713 F.2d 1423, 1427 (9th Cir. 1983).  In other words, "fair warning" is required of what conduct might transgress the tax laws before a criminal prosecution is appropriate.  *Raley v. Ohio*, 360 U.S. 423, 438 (1959).  Where such warning is not "in language that the common world will understand, of what the law intends to do if a certain line is passed . . . the government may not institute criminal proceedings."  *Mallas*, 762 F.2d at 364-65.

Therefore, courts have held that "the appropriate vehicle" to provide such a "fair warning" is "the *civil* procedure of administrative assessment, not a criminal prosecution."  *Id.* at 364 (emphasis in original); *Critzer*, 498 F.2d at 1163; *Harris*, 942 F.2d at 1131 ("[C]riminal prosecutions are a different story.").  In other words, the government must first bring a civil action or civil audit—and win—to provide notice that the alleged actions can be criminal.

Here, no such "fair warning" through the civil process has been given.  The government has attempted such a "fair warning" at least twice, but, if anything, those attempts have only confirmed the lawful nature of Mr. Fisher's compliance.

First, two civil examinations of Defendant's syndicated conservation easements have been litigated in U.S. Tax Court.  But those cases did not result in any "fair warning:" the tax court assessed no penalties, finding no accuracy-related

4

penalty for "gross valuation misstatement" was appropriate, nor was a penalty for "substantial understatement of income tax" or even for "negligence." *Robinson Laurel P'ship, LLC v. Comm'r of Internal Revenue*, No. 29318-12 (T.C. July 24, 2014) (attached hereto as Exhibit A); *Robinson Laurel P'ship, LLC v. Comm'r of Internal Revenue*, No. 2455-13 (T.C. July 17, 2014) (attached hereto as Exhibit B). In effect, the Tax Court "blessed" the transactions.

Second, perhaps the United States is seeking to provide "fair warning" through a civil case in this District that mirrors this case, although Defendant Fisher is not a party. There, the United States has alleged that defendants "organize, promote, or sell . . . a highly structured—and abusive—tax scheme involving the syndication of conservation easement donations." *United States v. EcoVest Capital*, No. 1:18-CV-05774 (Doc. No. 1 at ¶ 1) (N.D. Ga. Dec. 18, 2018); *see also id.* (Doc. No. 119 at 7) (court noting "this is not a normal case" and that "Defendants believe their activities were lawful and allowed by the tax code"). That case has not yet been resolved to provide the "fair warning" required to "institute criminal proceedings." *Mallas*, 762 F.2d at 365. Nonetheless, even in that civil case, the court has acknowledged that there is uncertainty regarding the law—barring a criminal case like this one. Recognizing this is "still a relatively specialized area of law," the court noted:

THE COURT: . . . I'm bothered by the contention that the partnerships

are basically inherently a scheme that is unlawful when the entire sort of purpose of the easement—of the statute and the allowance of this seems to be, in fact, to permit this.  <u>And I don't see anything that would say it was unlawful</u>.  And I don't think the government pointed me to anything that said the partnerships kind of by definition are unlawful.

. . .

But <u>the whole purpose of the law is in some ways to allow people to get the benefit of a tax credit and to help to conserve the land</u>.  So—but it is not because they are altruistic that they are doing this.  It is not just a donation without any benefit to them.  So <u>it is different than many other situations where it is just a sham as a partnership or a corporation</u>.

. . .

<u>We have a statutory structure that's set up to in some ways incentivize this conduct</u>.

*Id.* at 9:13-19; 10:13-19; 11:11-12 (emphasis added) (Totenberg, J.).  If that case is to provide "fair warning," it did not do so prior to any of the actions alleged in the Indictment and cannot do so unless and until there is a relevant ruling by the Court.

## III.   Legislative, Statutory, and Regulatory Background

The legislative history behind the deduction for conservation easement donations illustrates its complexity.  It also shows that while the IRS dislikes the deduction, and thus seeks to criminalize it, the deduction has seen broad support in Congress, which has made it more generous over time against the wishes of the IRS.  *See Summa Holdings, Inc. v. Comm'r of Internal Revenue*, 848 F.3d 779 (6th Cir. 2017) ("The [IRS] cannot fault taxpayers for making the most of the tax-minimizing opportunities Congress created.").  Even when originally adopted, the deduction was objected to by the IRS.  Theodore S. Sims, Perpetual Conservation Easements in the

21st Century, 33 UTAH ENVTL. REV. 41, 41 (2013).  It was passed "at the behest of conservation activists . . . by an overwhelming majority of Congress . . . in the hope of adding untold thousands of acres of primarily rural property for various conservation purposes."  *BC Ranch II*, 867 F.3d at 553-54.  Since its adoption, "the availability of such deduction has been substantially liberalized."  Sims, 33 UTAH ENVTL. REV. at 48.

In 2005, at the behest of the IRS, Congress's Joint Committee on Taxation published a proposal to update the law regarding conservation easements and other areas of the tax code.  J. Comm. on Taxation, Options to Improve Tax Compliance and Reform, JCS-2-05, 2005 WL 5783590 (Jan. 27, 2005).  Therein, the Committee noted that the law "creates significant administrative obstacles for the IRS with respect to easements," *id.* at 52, and proposed "substantially reduc[ing] the deduction," *id.* at 51.  But that aspect of the proposal met fierce opposition from Congress, with members taking to the floor to declare the proposal would "be a terrible mistake" and "Congress should reaffirm its commitment to environmental protection."  151 Cong. Rec. H10508-02, 2005 WL 3076980 (Nov. 17, 2005).

Congress *did* act in response to the proposal.  While the proposal suggested reducing the deduction,[4] Congress instead *made it more generous*.  Congress

---

[4] "In the end, the proposed reforms were largely ignored."  Sims, 33 UTAH ENVTL. L. REV. at 56.

increased the amount that can be deducted in the first year from 30% of adjusted gross income to 50%.  Congress additionally increased the carry-forward permitted from five years to fifteen.  Pub. L. No. 109-280, § 1206(a), 120 Stat. 780 (2006). The purpose of these changes was to make the deduction available to taxpayers with lower taxable incomes—a congressional goal also furthered by syndication.  Kate B. Deal, Incentivizing Conservation: Restructuring the Tax Preferred Easement Acceptance Process to Maximize Overall Conservation Value, 101 GEO. L. J. 1587, 1592 (Aug. 2013).

While those changes were originally temporary, they were later made permanent with several members of Congress taking to the floor to urge such action. 160 Cong. Rec. E1241-2, 2014 WL 3690102 (July 25, 2014); 160 Cong. Rec. E1168-02, 2014 WL 3510430 (Jul. 16, 2014) ("I rise today . . . in particular support of the provision that would make the current tax deduction for the contribution of conservation easements permanent.").

Years later, in 2017, Congress passed comprehensive tax reform.  Pub. L. 115-97.  The conference report noted that the deduction for conservation easements is more generous than most other deductions.  H9943-06, 2017 WL 6403294.  Yet, even while passing comprehensive reform, Congress took no action to reduce the deduction or eliminate it altogether.

After that, in 2019, bills were introduced in both chambers that would prevent

partnerships from taking a deduction that is more than two-and-a-half times the original amount invested.[5]  Neither passed.  H.R. 1992; S. 170 (116th Cong.).  Just last June, another bill was introduced in the Senate to limit the conservation easement deduction.  S. 2256 (117th Cong.).  That bill likewise did not pass.  Indeed, inclusion of reforms for conservation easement deductions in the Build Back Better Act are blamed for its failure to pass.  Peter Elkind, "The Tax Scam That Won't Die," ProPublica (June 17, 2022) (https://www.propublica.org/article/syndicated-conservation-easement-irs-tax-scam) (noting Sen. Sinema "represented a potentially decisive vote in her 50-50 chamber" and "the syndication-killer language was among the provisions she wanted out of the bill").

Even Congress's staunchest opponents of syndicated conservation easements have admitted that even those "taking advantage of the taxpayers"[6] are not committing a crime under current law.  *Id.* (noting a sponsor of a bill to limit the

---

[5] These bills (which did not pass) make clear that under current law a deduction higher than two-and-a-half times is permitted.

[6] Mr. Fisher has never been mentioned in any congressional investigation or testimony as abusing the tax deduction.  The Senate Finance Committee recently issued a report investigating abuse of syndicated conservation easements.  Mr. Fisher is not mentioned.  Comm. on Finance, Syndicated Conservation-Easement Transactions, S. Prt. 116-44 (116th Cong) (EcoVest, the defendant in the similar civil case, is mentioned).  Outside the government, the Brookings Institution published a similar report.  *See* Adam Looney, Charitable Contributions of Conservation Easements, Brookings Institution (May 2017).  Mr. Fisher was not mentioned.

deduction has stated "[i]t's *one degree off criminal* what they're doing" now, and his bill seeks to put an end to it, but has not yet passed) (emphasis added).

The IRS does not favor syndicated conservation easements and is seeking to outlaw them through enforcement, rather than through legislation. *See generally Kaufman v. Shulman*, 687 F.3d 21, 27 (1st Cir. 2012) ("[T]he IRS's reading of its regulation would appear to doom practically all donations of easements, which is surely contrary to the purpose of Congress.").[7]  But the IRS cannot criminalize actions that Congress has expressly authorized. *Summa Holdings*, 848 F.3d at 782 ("If the government can undo transactions that the terms of the Code expressly authorize, it's fair to ask what the point of making these terms accessible to the taxpayer and binding on the tax collector is."); *id.* at 785 (noting the IRS cannot "recharacterize the meaning of statutes" or "ignore their form, their words, in favor of [the IRS's] perception of their substance"); *see also* Robert Ramsey, A Dirty Dozen Myths About Conservation Easements and One Sad Truth, Exempt Organization Tax Review (May 2020) ("The IRS has declared war on conservation easements . . . the IRS's war is inconsistent with the law.").

### IV.    Analysis

---

[7] Indeed, the IRS has even contradicted its own private letter rulings condoning the structure alleged in the indictment. *Oakbrook Land Holdings v. Comm'r of Internal Revenue*, 119 T.C.M. (CCH) 1352 (T.C. 2020) ("We do note that the Commissioner's interpretation of improvements in this case contradicts his position in Priv. Ltr. Rul. 200836014.").

Even in this case, the government has acknowledged that "[t]he law surrounding conservation easement tax deductions—and when they can be 'syndicated' for sale to investors—is complex." (Berry Aff., Doc. No. 113-1 at ¶ 14). In fact, the Indictment notes syndicated conservation easements *can* be legal when they are "property structured," (Indictment ¶ 29), implying some are not, but no "fair warning" has been given that the structure alleged here is criminal. The Indictment focuses on three areas, each of which are uncertain enough that a federal crime cannot be charged: (1) economic substance; (2) appraisals; and (3) the dating of documents. (Indictment ¶ 41).[8] *See* Doc. No. 167 (explaining the charges).

### a. Economic Substance

The government has recognized that the "'syndication' of conservation easement tax deductions <u>can</u> be executed, and sometimes is executed in a legal way." (Berry Aff., Doc. No. 113-1, at ¶ 28). According to the government, the "key question" in determining whether the transaction is legal or criminal is "whether the individual taxpayer's investment in the partnership, or LLC, is a naked purchase of tax benefits—in which case it would be an abusive tax avoidance transaction—or whether the transaction had some independent 'economic substance.'" (*Id.*); *see*

---

[8] For the purposes of this motion, Defendant accepts the factual allegations as true; however, they are not admitted and will be disputed at trial.

11

*also* (*id.* at ¶¶ 36, 55, 57, 58, 75, 107, 108, 126); (Indictment ¶¶ 42(a), 136).

While Mr. Fisher intends to prove at trial that the transactions referred to in the Indictment *did* have economic substance, the law is sufficiently unclear on whether economic substance is even required. Contrary to the government's assertions in this case, the U.S. Tax Court has made clear time and again that economic substance is <u>not</u> required where Congress has specifically authorized the transaction. With respect to charitable donations, the Tax Court has expressed this point almost to frustration: "Have we not said sufficiently that gifts to charity need have no economic substance beyond the mere fact of the gift?" *RERI Holdings I, LLC v. Comm'r of Internal Revenue*, 107 T.C.M. (CCH) 1488 (T.C. 2014) (citing cases). Thus, even if it were true the alleged transactions were a "naked purchase of tax benefits," there has been no "fair warning" that doing so is illegal, must less criminal. *Hunter v. Comm'r of Internal Revenue*, 51 T.C.M. (CCH) 1533 (T.C. 1986) ("[A] taxpayer's desire to avoid or eliminate taxes by contributing cash or property to charities cannot be used as a basis for disallowing the deduction for that charitable contribution.") (quoting *Skripak v. Comm'r of Internal Revenue*, 84 T.C. 285, 316 (1985)).[9]

---

[9] The Indictment also makes various references to the vote by the partnerships to donate the conservation easements. (Indictment ¶¶ 43, 117, 189). This appears to be simply evidence in support of the alleged lack of economic substance, and thus also fails as a matter of law for the same reason. In any event, such a "vote" is a

The government may contend that while the donation does not require economic substance, the investment in the partnership or LLC to make the donation does. (Indictment ¶ 21). But for that proposition, too, there has been no "fair warning." To the contrary, no economic substance is required under current law because Congress expressly authorized partnerships to make charitable contributions. 26 U.S.C. § 702(a)(4); IRS Form 990, Schedule B ("A contributor includes . . . partnerships."). Thus, no non-tax business purpose is required. *RERI*, 107 T.C.M. (CCH) at *8 ("[I]f we were to find that the transaction . . . had no non-tax business purpose, again: So what?"); *Summa Holdings*, 848 F.3d at 787 ("If the code authorizes the 'formal' transactions the taxpayer entered into, then 'it is of no consequence that it was all an elaborate scheme to get rid of income taxes.'").[10]

**b. Appraisals**

While the "key question" is economic substance, the indictment appears to

---

normal part of the structure of a conservation easement transaction to obtain consent of the partners to make the donation. *See Deal*, 101 Geo. L. J. at 1596.

[10] In any event, were it relevant, the remedy for lack of economic substance is to disregard the tax consequences of the partnership. *Curtis Inv. Co. v. Comm'r of Internal Revenue*, 909 F.3d 1339, 1347 (11th Cir. 2018). That would have no effect here. *BC Ranch II*, 867 F.3d at 556 ("When a taxpayer makes a capital contribution to a partnership in exchange for an interest in the partnership, the transaction is tax-free to both the partner and the partnership."); *United States v. Woods*, 571 U.S. 31, 40 (2013) ("[P]artnerships themselves pay no taxes."). What is more, even disregarding the entire partnership would simply mean all the partners were tenants in common as owners of the property who would share in the deduction accordingly.

nonetheless hinge on "grossly inflated appraisals." *See*, *e.g.*, (Indictment ¶ 41). However, the same exact appraisal method was used in two transactions audited by the IRS and litigated in U.S. Tax Court, which found no "gross valuation misstatement." Ex. A, *Robinson Laurel*, No. 29318-12; Ex. B, *Robinson Laurel*, No. 2455-13. Thus, there has been no "fair warning" that the method used is a federal crime; instead, the U.S. Tax Court has expressly condoned such a method. Additionally, *EcoVest* involves the same issue and has not been resolved. *EcoVest*, No. 1:18-CV-05774 (Doc. No. 1 at ¶¶ 4, 150, 162); *id.* (Doc. No. 349-1 at 9).

The Indictment appears to allege the appraisals are "inflated" because they value easements at "multiples of the price paid to acquire an ownership interest in the Property Company that held the land." (Indictment ¶ 45). First, an interest in a company that owns actual real property cannot be fairly compared to the value of an easement. J. Comm. on Taxation Report, JCS-2-05, 2005 WL 5783590 at 51 (Jan. 27, 2005). But even if it could, it is not proper to equate *market value* (the purchase price) with *fair market value* (the amount permitted to be deducted). *Crimi v. Comm'r of Internal Revenue*, 105 T.C.M. (CCH) 1330, *21-22 (T.C. 1986) ("We expressed concern that the [expert] reports each adopted market value, as opposed to fair market value . . . [u]nder section 1.170A-1(a) and (c)(1), Income Tax Regs., our measure of value is fair market value . . . the two terms are not necessarily synonymous depending on how they are defined and used."); *Matter of Investors*

*Funding Corp. of New York*, 592 F.2d 134, 137 (2d Cir. 1979) ("[T]he contract price should not have been equated with the fair market value . . . ."); *Crimi*, 105 T.C.M. (CCH) at *25 ("We decline to rely on the values for undeveloped lots . . . because under the subdivision development analysis we look to developed lots of comparable properties, not undeveloped lots."). Thus, it is not reasonable to conclude one is engaged in a crime because fair market value exceeds some prior market value.[11]

---

[11] Indeed, as the Supreme Court and other courts have noted, valuation is uncertain, subjective, and variable by its nature. *City of New York v. Sage*, 239 U.S. 57, 60-61 (1915); *Ithaca Tr. Co. v. United States*, 279 U.S. 151, 155 (1929) ("Like all values, as the word is used by the law, it depends largely on more or less certain prophecies of the future, and the value is no less real at that time if later the prophecy turns out false than when it comes out true."); *Comm'r of Internal Revenue v. Marshall*, 125 F.2d 943, 946 (2d Cir. 1942) ("'[V]alue' involves a conjecture, a guess, a prediction, a prophecy."). So much so that even courts sometimes get valuation wrong. *Pine Mountain*, 978 F.3d at 1210-11 (11th Cir. 2020). That is because "valuation is not an exact science," *Blau v. Comm'r of Internal Revenue*, 924 F.3d 1261, 1276 (D.C. Cir. 2019), and there is a "degree of inherent unreliability" in valuation, particularly using the discounted cashflow method. *Glade Creek Partners, LLC v. Comm'r of Internal Revenue*, T.C. Memo 2020-148 (T.C. 2020). Valuation is thus "capable of resolution by the Court only through 'Solomon-like' pronouncements." *Frazee v. Comm'r of Internal Revenue*, 98 T.C. 554, 577 (1992); *Stanley Works v. Comm'r of Internal Revenue*, 87 T.C. 389, 408 (1986). The valuation of conservation easements, in particular, are uncertain and complex—and far more uncertain than valuing property itself. Testimony of George K. Yin, chief of Staff, J. Comm. on Taxation, JCX-14-05R at 2 ("For several reasons, determining the value of conservation easements may be even more difficult than in the general sense."); J. Comm. on Taxation Report, JCS-2-05, 2005 WL 5783590 at 49 ("Valuation is especially problematic because the measure of the deduction . . . is highly speculative, considering that, in general, there is no market and thus no comparable sales data for such easements."). Given that reasonable minds can differ regarding valuation—and particularly the valuation of an easement—it is hard to find "fair warning" that a certain valuation may be a federal crime.

That is especially true here because the Indictment ignores the valuation method *required* by the IRS's own regulations.  The IRS regulations specific to valuing conservation easements require that easements be valued at their *highest and best use*, not their *current use*:

> If before and after valuation is used, the fair market value of the contribution . . . must take into account not only the current use of the property but also <u>an objective assessment of how immediate or remote the likelihood is that the property, absent the restriction, would in fact be developed</u>, as well as any effect from zoning, conservation, or historic preservation laws that restrict <u>the property's highest and best use</u>. . . . Additionally, . . . an appraisal of the property after contribution of the restriction must take into account the effect of restrictions that will result in a reduction of the potential fair market value <u>represented by highest and best use but will, nevertheless, permit uses of the property that will increase its fair market value above that represented by the property's current use.</u>

Treas. Reg. § 1.170A-14(h)(3)(ii).  While the language seems clear, scholars have noted "[i]t's hard to know exactly what to make of that language," [12] and once again such uncertainty bars criminal prosecution.

Therefore, assessing easement value "must take into account not only the current use of the property, but also its highest and best use." *Kiva Dunes v. Comm'r*

---

[12] "It is hard to know exactly what to make of that language . . . [v]aluing land at its 'highest and best' use naturally denotes valuing it for use at its most profitable feasible level.  The quoted language seems implicitly to condone valuing property before imposition of a conservation restriction taking account of the highest and best use." Sims, 33 UTAH ENVTL. REV. at 52.

*of Internal Revenue*, T.C. Memo 2009-145 (2009). "A property's highest and best use is the highest and most profitable use for which it is adaptable and needed or likely to be needed *in the reasonably near future*." *Id.* (emphasis added). Often, and as condoned by the tax court, the highest and best use is determined by calculating the lot prices in a hypothetical future finished residential subdivision. *See*, *e.g.*, *id.*

And that is for good reason. The value of a conservation restriction exceeds purchase price, often by a lot, because the deduction accounts for the future development value a donor gives up. Bradford Updike and Bryan Mick, Conservation Easements: The Fed. Tax Rules & Special Considerations Applicable to Syndicated Transactions, 49 CREIGHTON L. REV. 293, 306 (2016) (noting the deduction is "based upon the economic benefits given up as a result of the land use restrictions associated with the easement."); *id.* at 311 ("[T]he value of the charitable federal income tax deductions can be fairly significant for the program investors depending upon the highest and best use of the real estate and the value of the development or investment rights given up by the program and its investors."); Deal, 101 Geo. L. J. at 1594. ("[T]he value of the easement itself, at least for purposes of calculating the resulting tax deduction is an *economic* value representing the right to develop the encumbered property.") (emphasis in original); Ramsey, Exempt Organization Tax Rev. at 280 ("A conservation easement's value is the value of the development rights that are forfeited in perpetuity when the easement is placed.").

17

As a result, the IRS has *required* that the highest and best use valuation be used.  The IRS's audit guide for its own agents notes that "an appraiser *must* determine the highest and best use" by "assess[ing] the likelihood that *the property would be developed* absent the conservation easement restriction."  IRS, Conservation Easement Audit Techniques Guide ("Audit Guide") at 43-44 (Jan. 24, 2018)  (available  at  https://www.irs.gov/pub/irs-utl/conservation_easement.pdf) (emphasis added); *see also id.* at 46 ("All professional appraisal organizations recognize that the HBU [highest and best use] of the property is a key element to a proper valuation.").  A taxpayer does not, as a matter of law, commit a federal crime by relying on the IRS's guidance.

And courts, including the Eleventh Circuit, have affirmed highest and best use valuations of conservation easements that far exceed the purchase price or basis. *See*, *e.g.*, *Pine Mountain*, 978 F.3d at 1200 (affirming $97 million deduction on property purchased for $37 million); *Kiva Dunes*, T.C. Memo 2009-145 (finding the fair market value of an easement to be $28.66 million on property purchased for $1.05 million);[13] *see also* Sims, 33 Utah Envtl. L. Rev. at 44-45 ("[I]f charitable contributions of conservation restrictions were limited to the contributor's basis,

---

[13] The *Kiva Dunes* valuation even included hypothetical man-made lakes and expansion of existing lakes, which had a "significant impact on lot value."  *Kiva Dunes*, 97 T.C.M. (CCH) 1818 at *4, *5 n. 19.

I.R.C. § 170(h) would not be especially controversial.  But they aren't, and it is.");
*id.* at 51 (noting "current fair market value is only the beginning" and valuation of a conservation easement "entail[s] conjectures"); Updike and Mick, 49 CREIGHTON L. REV. at 308 (noting "the deduction generally is not limited to basis"); Yin Testimony, JCX-14-05R at 2 ("Unlike clothing and household items, the value of a conservation easement generally exceeds the taxpayer's basis in the easement.").

Indeed, courts have found it proper to use hypothetical residential subdivisions to value a conservation easement, as alleged (and criminalized) here. *Crimi*, 105 T.C.M. (CCH) at *22, 25 ("The subdivision development method is a variation of the income approach previously recognized by this Court.   The subdivision development method values undeveloped land by treating the property as if it were subdivided, developed, and sold. . . . we conclude that the highest and best use of the subject property was for residential development as a 44-lot subdivision."); *Glade Creek Partners*, 120 T.C.M. (CCH) at *12.   And even the IRS's own experts have used hypothetical future residential subdivisions to value easements. *See*, *e.g.*, *Trout Ranch, LLC v. Comm'r of Internal Revenue*, 100 T.C.M. (CCH) 581 at *8 (2010), *aff'd*, 493 F. App'x 944 (10th Cir. 2012).  Indeed, the Tax Court has outlined the "six primary steps" of the subdivision method of valuation, which mirrors the method alleged in the Indictment.  *Crimi*, 105 T.C.M. (CCH) at *22 n. 28 (citing Appraisal Institute, The Appraisal of Real Estate, 370-76 (13th ed.

2008)).   And the Tax Court has criticized IRS experts for "fail[ing] to give the subdivision use the careful attention we think it deserved."   *Symington v. Comm'r of Internal Revenue*, 87 T.C. 892, 902 (T.C. 1986).   Even the IRS' own Audit Techniques Guide condones basing valuation on "what the 'finished' lots" in a hypothetical future resident subdivision "would sell for in the market place."   Audit Guide at 49.[14]   A taxpayer cannot, as a matter of law, commit a federal crime by relying on established case law and the IRS's audit guide.

### c.  **Dating Issues**

Lastly, the Indictment alleges that "[t]o generate the fraudulent tax deductions and enrich themselves," Mr. Fisher and others "backdated subscription agreements and other investment-related documents," (Indictment ¶ 41), "to make it appear as if the participants had timely purchased their units," (Indictment ¶ 60).   These allegations appear to support only Count One, a *Klein* conspiracy to defraud the United States.

At the outset, it should be noted that a *Klein* conspiracy requires that the alleged conspirators intended to harm the federal government.   *United States v. Whiteford*, 676 F.3d 348, 359 (3d Cir. 2012).   While monetary loss is not required,

---

[14] The United States is attempting "fair warning" by arguing in *EcoVest* that "the subject of the appraisal must always be the unimproved land in its current state." *EcoVest*, No. 1:18-CV-5774 at (Doc. No. 349-1 at 9).   That is contrary to law and IRS guidance, but, in any event, has not yet been resolved by the court.

an intention to harm is.  Here, no harm (or intention to harm) is alleged regarding the "backdating" allegations.  That is because there is no allegation the *partnership* made the donation of the conservation easement after the end of the year; the partnerships always donated the easements prior to the end of the year, and publicly recorded the easements with the register of deeds.  The Indictment only alleges that new *members* were admitted to the partnership after the end of the year.  Even if that were true, those actions, relating only to the internal affairs of the partnership, caused no harm to the government.  For example, if the partnership were entitled to a $1 million deduction, and there were ten equal partners, the deduction would "flow through" and each would deduct $100,000 (totaling $1 million).  If an additional 90 equal partners were admitted, those 100 equal partners would each deduct $10,000— again, totaling $1 million.  The deduction is the same.  *See Moore v. Comm'r of Internal Revenue*, 93 T.C.M. (CCH) 1275, *16 (T.C. 2007) ("[A]side from possible tax rate differentials among the three individuals (unsupported by any evidence in the record), the IRS is indifferent as regards the respective profit shares of each.").[15]

In any event, there are a host of tax laws and regulations that make clear the "backdating" allegations, even if they were true, are not unlawful—or at least are

---

[15] If these allegations support other charges, such as wire fraud, they should also be dismissed because no loss has been alleged.

uncertain enough as to not provide "fair warning" that they rise to a federal crime.

First, "it is clear that the parties to a contract can give the contract retroactive effect." *Moore*, T.C. Memo 2007-134 at *15 (applying Georgia law). The partnership can thus agree to admit its members with retroactive effect.[16]

What is more, here, the partnership agreements permitted amendments by the manager to add partners. ██████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

Congress has been clear that "a partner's distributive share of . . . deduction or credit is to be determined by the partnership agreement." *Martin v. Comm'r of Internal Revenue*, 43 T.C.M. (CCH) 1216 (T.C 1982). Congress has similarly been clear that amendments to the partnership agreement are permitted after the end of the year. Under 26 U.S.C. § 761, partnerships are permitted to make "any modifications of the partnership agreement" as long as they are made prior to "the filing of the partnership return" the following year. 26 U.S.C. § 761. IRS regulations are similarly explicit that "[a] partnership agreement may be modified with respect to a

---

[16] The lack of any harm or loss also means there was no "unwarranted tax benefit," supporting effective dating: "[T]here is a distinction between an effective date provision seeking to memorialize a prior oral agreement and an attempt to backdate an agreement in order to retroactively obtain an unwarranted tax benefit." *See Jacoby v. Comm'r of Internal Revenue*, 109 T.C.M. (CCH) 1365, *10 (T.C. 2015).

particular taxable year <u>subsequent to the close of such taxable year</u> . . . ."  26 C.F.R. § 1.761.1(C) (emphasis added); *see also* (IRS Publication 541 at 4) (noting that the partnership agreement "includes the original agreement and any modifications" and the "modifications can be oral or written").  Such action is explicitly permitted by law; it is not criminal.  *Martin*, 43 T.C.M. (CCH) at 1216 ("[I]t is true that partners can vary the terms of their partnership agreement at any time prior to the unextended due date of the partnership's tax return for the taxable year involved.  Such modifications may be made by either written or oral agreement.").

In fact, the IRS captures as partners for tax purposes even those with an *option* to purchase a partnership interest at the end of the year.  26 C.F.R. § 1.761-3(a)(3).[17] Under those regulations, an individual is treated as a partner as soon as he or she obtains the option to join the partnership, regardless of whether that partner had made their capital contribution.  26 C.F.R. § 1.761-3(a)(4).  Given this legal background, it is reasonable to believe such conduct, even if it were true, is legal. The law is not certain enough to make it criminal.

### d.  <u>In the Alternative, the Law is Unconstitutionally Vague</u>

In the alternative, and for the reasons cited above, the laws cited in the Indictment are unconstitutionally vague as applied to the conduct alleged in the

---

[17] The IRS appears to want to treat admission to a partnership after year-end as legal when it results in income (and income taxes) but not when it results in a deduction.

Indictment.  *See Palmer v. City of Euclid*, 402 U.S. 544, 545 (1971) (reversing a judgment because the ordinance charged was "so vague and lacking in ascertainable standards of guilt" that "*as applied*" to the defendant "it failed to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden") (emphasis added).  "A criminal statute is unconstitutionally vague if it 'fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden.'"  Because such conduct has repeatedly been found legal—by Congress, by the Tax Court, and by the IRS itself—no person of ordinary intelligence has been given fair notice that such statutes would encompass the alleged actions.  *See United States v. Ortega Torres*, 174 F.3d 1199, 1200 (11th Cir. 1999) (quoting *United States v. Batchelder*, 442 U.S. 114, 123 (1979); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18 (noting that a criminal conviction based on a vague law violates due process).  The Indictment should thus be dismissed.  *Wilson v. State Bar of Georgia*, 1323 F.3d 1422, 1427 (11th Cir. 1998) (noting that constitutional vagueness is a question of law for the Court).

## V.    Conclusion

"There is no 'patriotic duty to increase one's taxes,' as Judge Learned Hand memorably told us in the case that gave rise to the economic substance doctrine."  *Summa Holdings*, 848 F.3d 779, 787 (6th Cir. 2017).  "Anyone may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose the pattern

which will best pay the treasury." *Id.*   One such way is through conservation easements—a provision of the tax code that has enjoyed wide bipartisan support in Congress, even over the objection of the IRS.  The allegations in the indictment here have long been condoned by Congress, the U.S. Tax Court, and even the IRS.  The government should not be permitted to change course now and override the express provisions of the Internal Revenue Code through criminal prosecution.[18]  *Id.* at 790 ("The last thing the federal courts should be doing is rewarding Congress's creation of an intricate and complicated Internal Revenue Code by closing gaps in taxation whenever that complexity creates them."); *Garber*, 607 F.d at 100 (noting a criminal proceeding "is an inappropriate vehicle for pioneering interpretations of tax law."). There is no question the law in this area is complex.  But it is not criminal.  It furthers congressional goals of conserving land within the path of development without requiring the federal government to purchase and manage such land.   Until the government provides "fair warning" that the allegations here are illegal, a criminal prosecution violates due process, and this case should be dismissed.

[SIGNATURES AND CERTIFICATES BEGIN ON NEXT PAGE]

---

[18] Importantly, if this criminal case is dismissed, that does not validate the deduction. There remain civil audits and civil cases to challenge the amounts of the deductions. Furthermore, no matter what the result of any case, the easement has been placed in perpetuity and will remain even if the deduction is not upheld.

Respectfully submitted, this the 1st day of August, 2022.

_s/ Brett A. Switzer_

Brett A. Switzer
GA Bar No. 554141
Robert R. Ambler, Jr.
GA Bar No. 014462
WOMBLE BOND DICKINSON (US) LLP
271 17th Street, NW, Suite 2400
Atlanta, GA 30363-1017
Tel: 404-872-7000
Email: Brett.Switzer@wbd-us.com
Email: Robert.Ambler@wbd-us.com

Russ Ferguson
NC Bar No. 39671*
Claire J. Rauscher
NC Bar No. 21500*
Michael A. Ingersoll
NC Bar No. 52217*
WOMBLE BOND DICKINSON (US) LLP
301 S. College Street, Suite 3500
Charlotte, NC 28202
Tel: 704-331-4920
Email: Claire.Rauscher@wbd-us.com
Email: Russ.Ferguson@wbd-us.com
Email: Mike.Ingersoll@wbd-us.com

*Admitted Pro Hac Vice*

*Attorneys for Defendant Jack Fisher*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing document complies with the font and point selections approved by the court pursuant to L.R. 5.1B and 7.1D of the Northern District of Georgia.  The foregoing filing was prepared on a computer using 14-point Times New Roman font.

This 1st day of August, 2022.

 *s/ Brett A. Switzer*
Brett A. Switzer
GA Bar No. 554141

*Attorney for Defendant Jack Fisher*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing filing with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to all attorneys of record.

This 1st day of August, 2022.

 *s/ Brett A. Switzer*
Brett A. Switzer
GA Bar No. 554141

*Attorney for Defendant Jack Fisher*